United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THOMAS HENNIGHAN,

         Plaintiff,

    v.

INSPHERE INSURANCE SOLUTIONS,
INC., et al.,

         Defendants.

Case No.  13-cv-00638-WHO

**ORDER GRANTING
HEALTHMARKETS'S  MOTION TO
DISMISS WITH PREJUDICE**

Re:  Dkt. No. 46

## INTRODUCTION

Plaintiff Thomas Hennighan brings suit against defendants Insphere Insurance Solutions, Inc. ("Insphere"), and HealthMarkets, Inc. ("HealthMarkets"), for violations of the California Labor Code and California's Unfair Competition Law.[1]  HealthMarkets moves to dismiss with prejudice Hennighan's Second Amended Complaint ("SAC") for failure to state a claim against it. For the following reasons, HealthMarkets's Motion to Dismiss is GRANTED WITH PREJUDICE.

## FACTUAL BACKGROUND

For purposes of this Motion to Dismiss, the Court accepts as true the factual allegations in Hennighan's SAC.

Insphere was formed around November 2009.  SAC ¶ 8.  It previously conducted business

---

[1] The SAC states, "Because Defendant INSPHERE has conducted business under several different names throughout the years, for the sake of simplicity, Defendants HEALTHMARKETS and INSPHERE will be referred to as INSPHERE throughout most of the Complaint."  SAC ¶ 11.  As in the First Amended Complaint ("FAC"), this does not comport with Federal Rule of Civil Procedure 8 because "it fails to put each defendant on notice of the claim or claims asserted against [it]."  *McColm v. Anber*, No. 06-cv-7369-PJH, 2006 WL 3645308, at *3 (N.D. Cal. Dec. 12, 2006).  Hennighan has not heeded the Court's admonition that "Hennighan is advised to clean up this definitional problem in his amended pleading."  Dkt. No. 41 at 1 n.1.

United States District Court
Northern District of California

1    under the name United Group Association ("UGA").  SAC ¶ 8.

2           "[HealthMarkets] was founded in 1985 under the name UICI.  In 2004, UICI purchased

3    [HealthMarkets]."[2]  SAC ¶ 8.  A private equity group acquired UICI in 2006 and renamed it

4    HealthMarkets.  SAC ¶ 8.  HealthMarkets conducts its insurance distribution business through its

5    indirect subsidiary, Insphere.  SAC ¶ 8.  On information and belief, Insphere "is the alter ego" of

6    HealthMarkets "or vice versa," HealthMarkets is the parent company of Insphere, and "[t]here is

7    an obvious unity of interest and ownership between these two Defendants that the separate

8    personalities of [Insphere] and [HealthMarkets] no longer exist."  SAC ¶¶ 3 & 9.  Both defendants

9    were "acting with the consent, permission, and authorization" of each other, and they "ratified"

10   and "approved" each other's actions.  SAC ¶ 6.  "Furthermore, Plaintiff believes and thereby

11   represents that:  (1) the officers and directors are the same for both entities; (2) the funds and

12   assets of both entities have been comingled; (3) both entities have failed to follow required

13   corporate formalities; (4) there is identical equitable ownership of the two entities; (5) both entities

14   use the same office or business location; (6) both entities use the same employees/workforce; and

15   (7) there has been a failure to maintain an arms-length relationship amongst these equities.  (This

16   list is not comprehensive and Plaintiff believes more facts demonstrating the alter ego of

17   Defendants may exist.)"  SAC ¶ 9.

18          Insphere sells insurance policies and employs at least three categories of employees:  sales

19   agents, who sell selected insurance policies; sales leaders, who can earn commissions on their own

20   sales, but also train, supervise, and motivate sales agents; and division managers, who only train,

21   supervise, and motivate sales agents and leaders in their divisional office.  SAC ¶¶ 11-12.  While

22   sales leaders and division managers are generally paid from "overwrite commission" based on

23   their agents' sales, they "have no control over the business."[3]  SAC ¶ 13.

24   _____

25   [2] The Court is unclear what the SAC means by this.
     [3] Insphere, on the other hand, transfers, promotes, and terminates sales agents, sales leaders, and

26   division managers; determines all sales territories; prohibits employees from business associations
     with other insurance companies without a pre-existing contractual relationship; restricts employees

27   from selling unauthorized products; requires its employees to attend certain events, meet certain
     performance goals, and file regular reports; "has a practice of not mailing commission checks to

28   Sales Agents and Sales Leaders in order to force them to come into the division office regularly";
     controls all advertising and the types of products offered; strongly expects employees not to own

2

1      When a sales agent sells a policy, the application is sent to selected carriers for approval.

2   Insphere then requires the sales agent to take a cash advance on the prospective commission,

3   which Insphere treats as a loan subject to interest that the sales agent must repay even if the policy

4   is later rejected by the consumer or carrier.  SAC ¶ 14.  Until November 2009, sales leaders and

5   division managers were responsible for a variable percentage of their sales agents' outstanding

6   debt.  "Productive" sales agents may be promoted as sales leaders, but their loans are paid off

7   through deductions from their overwrite commission.  SAC ¶ 14.

8      Hennighan "began his employment with Defendant INSPHERE in May 2010 as a Sales

9   Agent."[4]  SAC ¶ 10.  During his approximately two years in that position, he became one of the

10  top sales agents at Insphere, earning many awards and accolades.  SAC ¶ 12.  Although Insphere

11  paid Hennighan an 8.5 percent commission rate on sold policies when he began working, the rate

12  was lowered to six percent in November 2010, and Hennighan was "required [] to reimburse"

13  Insphere for the rate difference on past sales, plus interest.  SAC ¶ 15.  Also, Insphere would

14  sometimes demand return of his commission checks.  SAC ¶ 15.  As part of his work, Hennighan

15  would have to spend his own money on travel, the cost of acquiring new leads, computer

16  equipment, phone costs, licenses, insurance, and business attire, costing "as much as tens of

17  thousands of dollars."  SAC ¶ 16.

18      "During most of his employment" at Insphere, Hennighan did not believe Insphere was

19  paying its sales agents and leaders properly.  SAC ¶ 17.  On November 18, 2011, Hennighan filed

20  a complaint with the Labor Commissioner alleging violations of the Labor Code because Insphere

21  misclassified its employees as independent contractors and was not paying them or providing

22  proper itemized statements.  SAC ¶¶ 17 & 22.  Hennighan's direct supervisor told him that he was

23

24  _____

    or operate another business; determines all commissions; "owns and controls all sales prospects
25  and clients, and requires Sales Agents and Sales Leaders to purchase sales leads" from Insphere;
    determines whether to accept insurance applications; calculates compensation based on anticipated
26  profits from accepted applications; provides stock options and 401(k), which employees may lose
    if they "associate" with other insurance companies; provides company rules; performs and
27  mandates performance reviews; and requires employees to sign agreements not to compete with
    Insphere during or after their employment and to indemnify Insphere for all torts.  SAC ¶ 13.
28  [4] This conflicts with the FAC's allegation that "Plaintiff HENNIGHAN began his employment
    with Defendant INSPHERE in May 2005 as a Sales Agent."  FAC ¶ 10.

United States District Court
Northern District of California

1    causing problems through his complaint and said that it was "not a smart move," that "he would

2    have no friends," and not to "throw this job away." SAC ¶ 18. The "hostile work environment"

3    created by his supervisor and the fear of similar retaliation from seeing how Insphere treated other

4    sales leaders and agency managers who filed complaints with the Labor Commissioner caused

5    Hennighan "extreme anxiety and stress," affecting his work performance and home life, and

6    resulting in lower sales and income. SAC ¶ 19. Around April 27, 2012, Hennighan was notified

7    that his "Independent Contractor Agreement" was being cancelled, thus ending his employment

8    with Insphere. SAC ¶ 20.

9                                    **PROCEDURAL BACKGROUND**

10           The Court incorporates by reference its earlier discussion of this case's procedural history

11    in the Order Granting Motion to Dismiss First Amended Complaint with Leave to Amend. Dkt.

12    No. 41 ("Order"). HealthMarkets filed a motion to dismiss the First Amended Complaint

13    ("FAC") on July 17, 2013. Dkt. No. 37. On August 29, 2013, the Court granted HealthMarkets's

14    motion to dismiss the FAC with leave to amend, finding that Hennighan did not adequately plead

15    that HealthMarkets was Hennighan's employer or was Insphere's alter ego. Hennighan filed his

16    SAC on September 18, 2013. Dkt. No. 44. HealthMarkets now moves to dismiss the SAC. Dkt.

17    No. 46.

18           The SAC asserts the same causes of action as the FAC: (1) unlawful discharge,

19    discrimination, and retaliation under California Labor Code Sections 98.6 and 1102.5; (2)

20    wrongful termination in violation of public policy codified in California Labor Code Sections

21    98.6, 1102.5, 204, 226, 226.7, 227, 510, 512, 1194, and 2802 and Business and Professions Code

22    Section 17200; (3) failure to immediately pay wages upon discharge under California Labor Code

23    Section 201; (4) failure to make agreed upon vacation payments under California Labor Code

24    Sections 227 and 227.3; (5) failure to provide itemized wage statements under California Labor

25    Code Section 226; (6) failure to provide meal and break periods under California Labor Code

26    Sections 226.7 and 512; (7) failure to pay overtime wages under California Labor Code Sections

27    510 and 1194; (8) failure to indemnify work-related expenditures under California Labor Code

28    Section 2802; (9) unlawful, unfair, and fraudulent business practices under Business and

United States District Court
Northern District of California

4

1    Professions Code Section 17200 as evidenced by violation of public policy and California Labor

2    Code Sections 98.6, 1102.5, 204, 226, 226.7, 227, 510, 512, 1194, and 2802; and (10) violations

3    warranting penalties under the Private Attorneys General Act of 2004, California Labor Code

4    Sections 2698 and 2699.

5                                      **LEGAL STANDARD**

6              A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

7    pleadings fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The

8    Court must "accept factual allegations in the complaint as true and construe the pleadings in the

9    light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519

10   F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the

11   nonmoving party's favor, *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005). A complaint

12   may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its

13   face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility

14   when the pleaded factual content allows the court to draw the reasonable inference that the

15   defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

16   (2009). However, "a complaint [does not] suffice if it tenders naked assertions devoid of further

17   factual enhancement." *Id.* (quotation marks and brackets omitted). The court need not "assume

18   the truth of legal conclusions merely because they are cast in the form of factual allegations." *W.*

19   *Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

20                                        **DISCUSSION**

21   **I.      HENNIGHAN FAILS TO ADEQUATELY PLEAD THAT HEALTHMARKETS IS**

22   **         LIABLE UNDER THE CALIFORNIA LABOR CODE.**

23            Hennighan fails to adequately plead that HealthMarkets is his employer and that he may

24   bring claims against it under the California Labor Code. As the Court noted in its previous Order,

25   "[t]he principal test of an employment relationship is whether the person to whom service is

26   rendered has the right to control the manner and means of accomplishing the result desired." *S. G.*

27   *Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989). "California courts

28   consider a number of additional factors, including: the right of the principal to discharge at will,

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1    without cause . . . whether the work is usually done under the direction of the principal . . . and

2    whether the parties believe they are creating an employer-employee relationship." *Juarez v. Jani-*

3    *King of Cal., Inc.*, 273 F.R.D. 571, 581 (N.D. Cal. 2011).  While courts may consider whether an

4    alleged employer "engaged" the employee or "suffered" or "permitted" him to work, "[c]ontrol

5    over how services are performed is an important, perhaps even the principal, test for the existence

6    of an employment relationship." *Martinez v. Combs*, 49 Cal. 4th 35, 64, 76 (2010).

7            As with the FAC, Hennighan pleads no facts showing that he has an employment

8    relationship with HealthMarkets.  The SAC adds little to what was pleaded in the FAC.  The only

9    additions are (1) that HealthMarkets "conducts its insurance distribution business through its

10   indirect insurance agency subsidiary," Insphere; (2) that Insphere "has conducted business under

11   several different names throughout the years"; and (3) a formulaic recitation of factors that may

12   show an alter-ego relationship, but completely devoid of any factual claims to support them.  SAC

13   ¶¶ 8-9.  Again, there is no allegation that HealthMarkets was Hennighan's employer or that he was

14   its employee, nor is there any allegation of any fact to even suggest that HealthMarkets exercised

15   any control over him.  Similarly, there are also no facts pleaded showing that he was engaged by

16   or allowed to work for HealthMarkets.

17           The Supreme Court has made clear that "a plaintiff's obligation to provide the grounds of

18   his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of

19   the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal punctuation

20   omitted).  Despite the Court's admonition in its previous Order that Hennighan needed to plead

21   more facts showing an employment relationship with HealthMarkets to survive a motion to

22   dismiss, he has not done so.  For that reason, he fails to adequately state any claim against

23   HealthMarkets under the California Labor Code.

24   **II.     HENNIGHAN FAILS TO ADEQUATELY PLEAD THAT HEALTHMARKETS IS**

25           **INSPHERE'S ALTER EGO.**

26           Hennighan fails to adequately plead that HealthMarkets is liable to him for Insphere's

27   actions under the alter ego doctrine.  As explained in the previous Order, "The alter ego doctrine

28   arises when a plaintiff comes into court claiming that an opposing party is using the corporate

6

1    form unjustly and in derogation of the plaintiff's interests." *Mesler v. Bragg Mgmt. Co.*, 39 Cal.

2    3d 290, 300 (1985). The doctrine allows "the court [to] disregard the corporate entity and [to]

3    hold the individual shareholders liable for the actions of the corporation" when it would be just to

4    do so. *Id.* The doctrine has two elements: "First, there must be such a unity of interest and

5    ownership between the corporation and its equitable owner that the separate personalities of the

6    corporation and the shareholder do not in reality exist. Second, there must be an inequitable result

7    if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v.*

8    *Super. Ct. of Tuolumne Cnty.*, 83 Cal. App. 4th 523, 538 (2000).

9            With regard to the first element, "The factors which may show the 'unity of interest' issue

10   vary according to each case and are fact specific. Among the facts which can be considered are

11   financial issues (e.g., was the corporation adequately capitalized?); corporate formality questions

12   (e.g., was stock issued, are minutes kept and officers and directors elected, are corporate records

13   segregated?); ownership issues (e.g., what is the stock ownership picture?); commingling issues

14   (e.g., are corporate assets commingled, does the parent company merely use the corporate shell of

15   the subsidiary to obtain goods and services for the parent company?); etc." *Tomaselli v.*

16   *Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1285 n.13 (Ct. App. 1994). Despite the many ways

17   available to show unity of interest, Hennighan provides nothing more than naked assertions, such

18   as "there has been a failure to maintain an arms-length relationship amongst these equities" and

19   "both entities have failed to follow required corporate formalities," bereft of any factual support.

20   SAC ¶ 9. Such conclusory legal assertions presented in the guise of factual allegations are

21   insufficient to meet the test of plausibility set out in *Twombly* and *Iqbal*.

22           With regard to the second element, the plaintiff must show an inequitable result will occur

23   if the two entities are not treated as one, as well as "some conduct amounting to bad faith." *Leek*

24   *v. Cooper*, 125 Cal. Rptr. 3d 56, 70 (2011). Here, Hennighan shows neither. He says that "an

25   unjust result may occur." SAC ¶ 9. But Insphere remains a defendant in the case, and Hennighan

26   does not articulate any inequity that would result by refusing to pierce the corporate veil. As the

27   California Court of Appeal held in *Leek v. Cooper,* "there is nothing to indicate that [the plaintiff],

28   if successful against the corporation, will not be able to collect on any judgment against the

United States District Court
Northern District of California

1    corporation. Absent such evidence, plaintiffs cannot show that the result will be inequitable, and

2    have not stated the second element of an alter ego claim." 125 Cal. Rptr. 3d at 70. That finding is

3    also true here.

4         Hennighan argues that "factual support is not the standard to survive a motion to dismiss"

5    and quotes *Iqbal* for the proposition that Federal Rule of Civil Procedure 8 does not require

6    "detailed factual allegations." Opp'n 4 (quoting *Iqbal*, 556 U.S. at 678). While the latter

7    statement is true, Hennighan's overall argument displays a serious misunderstanding of the law.

8    The Supreme Court unambiguously held, "A claim has facial plausibility when the plaintiff *pleads*

9    *factual content* that allows the court to draw the reasonable inference that the defendant is liable

10   for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added). As the court continues in

11   *Iqbal*, proper pleading "demands more than an unadorned . . . accusation. A pleading that offers

12   labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.

13   Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."

14   *Id.* (citations, brackets, and quotation marks omitted). Paragraph 9 of the SAC, upon which

15   Hennighan primarily relies, contains *no* "factual enhancements" whatsoever and appears to be

16   nothing more than a conglomeration of various factors that courts have used in applying the alter

17   ego doctrine. Yet Hennighan persists in arguing that his conclusory assertions are proper factual

18   allegations.

19        *Iqbal* holds, "a court considering a motion to dismiss can choose to begin by identifying

20   pleadings that, because they are no more than conclusions, are not entitled to the assumption of

21   truth. While legal conclusions can provide the framework of a complaint, they must be supported

22   by factual allegations." *Iqbal*, 556 U.S. at 679. Nothing Hennighan proffers to show that

23   HealthMarkets is Insphere's alter ego is entitled to the assumption of truth because he has

24   provided nothing more than conclusions.

**CONCLUSION**

26        Hennighan has had three opportunities to show that HealthMarkets may be liable to him.

27   In its previous Order, the Court explained what Hennighan needed to do to survive a motion to

28   dismiss. He was not able to follow that advice. The Court finds that additional pleading would be

8

1   futile.  Accordingly, HealthMarkets's Motion to Dismiss the SAC as to HealthMarkets is

2   GRANTED WITH PREJUDICE.

3        **IT IS SO ORDERED.**

4   Dated: November 13, 2013

5   _____

6   WILLIAM H. ORRICK
    United States District Judge

United States District Court
Northern District of California