1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   THOMAS HENNIGHAN,                    Case No. 13-cv-00638-WHO

            Plaintiff,
8
                                         **ORDER ON CROSS MOTIONS FOR**
9       v.                               **SUMMARY JUDGMENT**

10  INSPHERE INSURANCE SOLUTIONS,        Re: Dkt. Nos. 59, 65
    INC.,
11
            Defendant.
12

13                          **INTRODUCTION**

14          Determining whether an individual is an independent contractor or employee requires a

15  fact-intensive analysis that is not often susceptible to resolution on summary judgment.  Plaintiff

16  Thomas Hennighan is an insurance sales agent who signed an independent contractor agreement

17  with defendant Insphere Insurance Solutions, Inc., and each party has asked me to determine his

18  classification as a matter of law.  Hennighan was paid only commissions, had his own clients, kept

19  his own hours (more than 50 percent of which were spent out of the office), and paid his own

20  taxes and expenses.  While Insphere had certain expectations about his sales results, it did not

21  exercise sufficient control over the means and methods that Hennighan used to do his job to make

22  him an employee.  No jury could reasonably find differently, so I will GRANT Insphere's motion

23  for summary judgment and DENY Hennighan's motion for partial summary judgment.

24                          **FACTUAL BACKGROUND**

25          Insphere is in the business of selling insurance policies.  Hennighan used to sell policies

26  for it.  His relationship with Insphere began on April 23, 2010, when he signed a contract entitled

27  "Independent Insurance Agent Commission-Only Contract" with Insphere.  Pl. Dep. Ex. 1.  The

28  agreement stated,

United States District Court
Northern District of California

**SECTION VII – INDEPENDENT CONTRACTOR**

By executing this Contract, I [Hennighan] recognize and understand that I am an independent contractor and nothing in this Contract or otherwise is intended to create an employer/employee relationship between Me and Insphere or an Insurance Company. . . . As an independent contractor, I will decide when, where, and the manner and means to conduct My business activities. While Insphere and/or its agents or representatives may from time to time provide Me with models and guidelines, I recognize and acknowledge that I have complete discretion to set My business hours and schedule.

As an independent contractor, I will be responsible for payment of all expenses and fees incurred by Me, including but not limited to business overhead, transportation, state and federal income tax, self-employment tax, social security tax, unemployment tax and workers' compensation. I am responsible for and shall pay all taxes, duties, assessments and other government charges related to My performance under this Contract.

If Insphere or an Insurance Company, or any of their respective agents or representatives, takes a position that I feel is contrary to My independent contractor status or requires Me to act in such a manner that I believe to be inconsistent with My independent contractor status, I agree to notify Insphere immediately . . . of such conduct.

Pl. Dep. Ex. 1, Section VII, at 6-7. Either Hennighan or Insphere could terminate the agreement at will. Pl. Dep. Ex. 1, Section X, at 8. Hennighan believed that he was hired to be a salesman for Insphere. Pl. Dep. 68:2-8. As part of this agreement, Hennighan would receive a commission whenever he successfully sold a policy for Insphere. Pl. Dep. 88:18-89:8. Hennighan read the agreement before he signed it. Pl. Dep. 134:3-5.

On the same day that he signed the contract, Hennighan also signed an "Administrative Fee Acknowledgement," which stated, "[a]s an independent contractor, I agree that I will be responsible for payment of all expenses and fees incurred by Me, or by Insphere on My behalf, including the $130.00 administrative fee required to process My Contract application, appointment fees, business cards and other miscellaneous fees related to My Contract." Pl. Dep. Ex. 2.

Shortly thereafter, in May or June 2010, Hennighan paid for and took online training to get a California health and life insurance license. Pl. Dep. 37:5-17. He paid for and received that license in June 2010. Pl. Dep. 35:7-18. He also paid for and took continuing education requirement classes in order to maintain his license. Pl. Dep. 38:25-39:22. In 2012, he paid for the renewal of his license. Pl. Dep. 35:19-24. There is no evidence that he ever received or requested reimbursement for these expenses.

2

United States District Court
Northern District of California

1    Insphere offered various insurance products and carriers that Hennighan could sell.  Pl.

2  Dep. 58:1-11.  These products included life and health insurance, and supplemental dental, vision,

3  and disability policies.  Pl. Dep. 70:19-22.  Although Insphere brought certain products to

4  Hennighan's attention, Hennighan could decide which products he would or would not sell.  Pl.

5  112:3-19.

6    Hennighan had the opportunity to pursue prospective policyholders from a variety of

7  sources.  Schooler Mot. Decl. (Dkt. No. 61) ¶ 3.  Hennighan testified that there are "countless"

8  ways to get "leads," i.e., potential clients, including "talk[ing] to people on the street," purchasing

9  them, or through networking.  Pl. Dep. 79:7-19, 80:10-20.  Hennighan purchased leads and even

10  paid for a membership in a "tip club" to seek leads.  Pl. Dep. 80:10-20, 81:14-82:5.  Ultimately,

11  successful leads would become Hennighan's own clients.  Pl. Dep. 131:2-11.  However, a witness

12  for Hennighan claims that Insphere "owns and controls all sales prospects and clients."  Shirley

13  Umamoto Mot. Decl. (Dkt. No. 68) ¶ 12.

14    For work, Hennighan paid for or provided his own laptop (Pl. Dep. 119:22-120:6), cellular

15  phone and monthly usage fees (Pl. Dep. 120:11-22), printer (Pl. Dep. 121:5-18), paper and toner

16  (Pl. Dep. 122:6-13), and car (Pl. Dep. 122:14-124:3).  Hennighan also paid for the insurance and

17  gas on his car, even when he used it while doing work for Insphere.  Pl. Dep. 123:14-20.  There is

18  no evidence that he ever received or requested reimbursement for these expenses.  Insphere

19  provided Hennighan with access to its San Jose, California, office for use when meeting clients,

20  but he did not have an assigned office.  Pl. Dep. 117:2-23.  He had to sign up to use office space

21  for a day.  *Id.*  Hennighan worked outside of the office more than 50 percent of the time.  Pl. Dep.

22  237:15-238:7.  He kept his own office in Santa Cruz, California.  Pl. Dep. 183:2-16.

23    Hennighan could sell insurance anywhere in California and did not need approval to set up

24  an appointment with a potential client.  Pl. Dep. 77:13-20, 146:23-147:2.  He initially worked

25  three days a week in the San Jose office, but then decided to work either at home or in his Santa

26  Cruz office.  Pl. Dep. 183:2-16.  Much of his work was done at clients' houses, in public settings,

27  or on the road.  Pl. Dep. 119:17-19, 183:2-16, 237:15-238:7.

28    Larry Roth was the San Jose office's Agency Manager during the last few months of

3

1   Hennighan's contract with Insphere and remains the manager to this day.  Roth Decl. (Dkt. No.

2   60) ¶¶ 1, 3.  Roth conducts a weekly sales meeting that typically occurs on Tuesday and usually

3   lasts around an hour and one-half to two hours.  Roth Decl. ¶ 2.  While attendance at the sales

4   meetings by agents is voluntary, he generally encourages them to attend if they feel it would be

5   helpful for them to share marketing and related experiences with other agents.  *Id.*  Occasionally,

6   agents are asked to attend product training to ensure that they comply with rules and regulations

7   regarding the marketing of insurance and related products.  *Id.*

8          Hennighan, however, says that he was "required" to attend annual regional meetings, to

9   participate in a weekly call-in team meeting, and to participate on a call-in production report

10   meeting three times a week.  Hennighan Mot. Decl. (Dkt. No. 66) ¶¶ 12-15.  He says that Insphere

11   was careful about not calling the meetings "mandatory," but there was some expectation that they

12   had to be attended.  Pl. Dep. 142:20-25.  Insphere also "strenuously advised" him that if he wanted

13   to remain "employed by Insphere," he had to attend every such meeting.  Hennighan Mot. Decl.

14   ¶ 16.  Other employees also testified that sales agents were required to participate in weekly call-

15   ins and meetings.  Greg Umamoto Mot. Decl. (Dkt. No. 69) ¶ 5; Shirley Umamoto Mot. Decl. ¶ 3.

16   Agents were held accountable and threatened with termination if they missed phone-in meetings.

17   O'Connell Mot. Decl. (Dkt. No. 67) ¶ 31-33.

18          Aside from the various meetings, agents "are not regularly in attendance" at the San Jose

19   office but rather market and sell insurance and related products, and communicate with potential

20   policyholders or other customers, on their own schedules and as they see fit.  Roth Decl. ¶ 2.  But

21   one employee claims that sales agents are required to go into the San Jose office regularly.  Shirley

22   Umamoto Mot. Decl. ¶ 22.  Roth asserts that other than periodically reviewing agents' sales

23   reports, he did not set an agent's work schedule or supervise or monitor an agent's work.  Roth

24   Decl. ¶ 2.  He contends that he did not formally evaluate agents' or Hennighan's work.  Roth Decl.

25   ¶ 3.  However, a former employee says that "Insphere requires performance evaluations" and sales

26   agents are required to fill out goal sheets against which they are held accountable.  Shirley

27   Umamoto Mot. Decl. ¶ 17.

28          Insphere paid Hennighan commissions; it did not provide him with a salary or wages.  Pl.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    Dep. 88:10-89:4.  He never filled a time sheet for Insphere.  Pl. Dep. 88:14-17.  (However,

2    insurance carriers would sometimes award Hennighan bonuses if he sold enough of their policies.

3    Pl. Decl. 99:1-25.)  Because Hennighan was free to establish his own schedule and determine the

4    amount of investment, time, and otherwise that he wished to make in selling Insphere products,

5    Hennighan bore the risk of profit or loss by controlling the amount of time, effort, and financial

6    investment he chose to put into his sales activities.  Schooler Mot. Decl. ¶ 2.  Insphere did not

7    provide him with vacation pay, holiday pay, or group health insurance, and no one ever told him

8    that he would be eligible for it.  Pl. Dep. 86:22-87:17.  No one at Insphere ever told him that he

9    could not take a lunch or rest break when he wanted to.  Pl. Dep. 140:21-142:4, 241:24-242:4.

10        Two witnesses for Hennighan claim that Insphere expects its sales agents to not have

11   outside businesses or to sell other companies' products.  Shirley Umamoto Mot. Decl. ¶¶ 31, 34;

12   O'Connell Mot. Decl. ¶ 19.  One of them claims that Insphere agents were not allowed to have

13   unapproved outside appointments and that she was told to warn a sales agent that if the agent did

14   not give up her outside appointments, she would be terminated.  O'Connell Mot. Decl. ¶¶ 4, 5.

15        Hennighan sold insurance policies outside of his relationship with Insphere because he felt

16   that he needed more work.  Pl. Dep. 107:16-18.  Through Insphere, Hennighan had appointments

17   to sell for insurance carriers such as Aetna, Health Net, HealthMarkets, Blue Cross Anthem,

18   Genworth, and ING, but Insphere did not get its agents the ability to sell anunuities.  Pl. Dep.

19   103:9-19, 105:3-18.  So Hennighan got his own appointments outside of Insphere with Aviva and

20   other insurance companies to sell annuities.  Pl. Dep. 103:9-104:23, 136:24-137:1.  He reached out

21   to Steven Valdez of First Authority to get an annuity contract because Hennighan felt that his

22   commissions were being cut back by Insphere and he needed to make money.  Pl. Dep. 106:1-

23   107:13.

24        Hennighan contracted with Insphere to only sell policies throughout California.  Pl. Dep.

25   145:20-23, 146:23-147:2.  Through Valdez, Hennighan became licensed to sell insurance in

26   Arizona, Texas, and South Carolina.  Pl. Dep. 146:4-22.  In addition, Hennighan was appointed

27   with Cigna Health and Life Insurance Company (Pl. Dep. 109:12-16, 111:6-12), Humana

28   Insurance Company (Pl. Dep. 109:17-23), Assurety Life (Pl. Dep. 112:20-22), Blue Shield of

5

California (Pl. Dep. 112:25-113:18), Time Insurance Company (Pl. Dep. 113:21-114:1), Golden

Rule Insurance Company (Pl. Dep. 114:9-14), Guarantee Trust Life (Pl. Dep. 114:15-16), and

Royal Neighbors of America (Pl. Dep. 115:10-11).[1]

Hennighan reported on his tax returns that he did not receive any wages in 2010, 2011, and

2012. Pl. Dep. Exs. 4 (2010 tax return) & 5 (2012 tax return); McGuigan Decl. Ex. 6 (2011 tax

return). Instead, Hennighan reported earning business income and deducted various business

expenses, e.g., for his cell phone, lead purchases, and driving mileage. *Id.*

On November 18, 2011, Hennighan filed a complaint with the California Division of Labor

Standards Enforcement alleging that he was improperly treated as an exempt employee and that

Insphere did not pay all his wages. Pl. Dep. Ex. 6. On February 2, 2012, after a conference was

held to determine the validity of the claim, a Deputy Labor Commissioner determined that

Hennighan was an independent contractor. Pl. Dep. Ex. 8.

Roth never met Hennighan after he was assigned to the San Jose office in February 2012

until he was deposed in this action. Roth Decl. ¶¶ 1, 4. After Roth started in San Jose, Hennighan

had no contact with the office, sold no insurance policies or other products, and attended no

meetings at the office. Roth Decl. ¶ 4. Based on Hennighan's inactivity for about two months,

Roth contacted Insphere's corporate office in April 2012 to initiate termination of Hennighan's

contract. *Id.* Roth claims that his decision was not influenced by Hennighan's complaint to the

California Labor Commissioner and he is not sure he was even aware of Hennighan's complaint

when he initiated the termination. *Id.* On April 26, 2012, Insphere sent Hennighan a contract

termination letter based on Roth's recommendation. Roth Decl. ¶ 5; Smith Decl. Ex. 3. Mark

Smith, Insphere's Chief Operating Officer, did not know that Hennighan had filed a complaint

against Insphere when he signed the termination letter based on Roth's recommendation. Smith

Decl. ¶ 2.

---

[1] At the hearing on the motion, Hennighan's counsel claimed that Hennighan had business outside
of Insphere without Insphere's knowledge. Insphere's counsel replied that it was Hennighan's
own supervisor who put Hennighan in touch with First Authority.

United States District Court
Northern District of California

United States District Court
Northern District of California

**PROCEDURAL BACKGROUND**

Hennighan filed this action in the Superior Court of California, County of Santa Clara, on January 22, 2013, and it was removed to this Court on February 13, 2013. Dkt. No. 1. After several motions to dismiss and various stipulations, Insphere remains the sole defendant. The Second Amended Complaint contains the following causes of action: (1) unlawful discharge, discrimination, and retaliation under California Labor Code Sections 98.6 and 1102.5; (2) wrongful termination in violation of public policy codified in California Labor Code Sections 98.6, 1102.5, 204, 226, 226.7, 227, 510, 512, 1194, and 2802 and Business and Professions Code Section 17200; (3) failure to immediately pay wages upon discharge under California Labor Code Section 201; (4) failure to make agreed upon vacation payments under California Labor Code Sections 227 and 227.3; (5) failure to provide itemized wage statements under California Labor Code Section 226; (6) failure to provide meal and break periods under California Labor Code Sections 226.7 and 512; (7) failure to pay overtime wages under California Labor Code Sections 510 and 1194; (8) failure to indemnify work-related expenditures under California Labor Code Section 2802; (9) unlawful, unfair, and fraudulent business practices under Business and Professions Code Section 17200 as evidenced by violation of public policy and California Labor Code Sections 98.6, 1102.5, 204, 226, 226.7, 227, 510, 512, 1194, and 2802; and (10) violations warranting penalties under the Private Attorneys General Act of 2004, California Labor Code Sections 2698 and 2699.

On March 12, 2014, Insphere filed a motion for summary judgment on all causes of action. Dkt. No. 59. On the same day, Hennighan filed a motion for partial summary judgment on the issue of his classification. Dkt. No. 65. A hearing on the motions was held on April 16, 2014.

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at

7

1    trial. The moving party need only demonstrate to the court "that there is an absence of evidence to

2    support the non[-]moving party's case." *Id.* at 325.

3           Once the moving party has met its burden, the burden shifts to the non-moving party to

4    "designate specific facts showing a genuine issue for trial." *Id.* at 324 (quotation marks omitted).

5    To carry this burden, the non-moving party must "do more than simply show that there is some

6    metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

7    475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient;

8    there must be evidence on which the jury could reasonably find for the [non-moving party]."

9    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

10           In deciding a summary judgment motion, the court must view the evidence in the light

11    most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

12    "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

13    inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for

14    summary judgment." *Id.* However, conclusory or speculative testimony in affidavits is

15    insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g*

16    *Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "uncorroborated and self-

17    serving" testimony that "flatly contradicts [ ] prior sworn statements" cannot create a genuine

18    issue of fact. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).

19           A district court need not consider evidence in the record "unless it is brought to the district

20    court's attention" because the court is "not required to comb the record to find some reason" to

21    grant or deny summary judgment; rather, "if a party wishes the court to consider [evidence for a

22    particular issue], the party should bring that desire to the attention of the court." *Carmen v. S.F.*

23    *Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation and internal punctuation

24    omitted); *see also Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (stating that the court is not

25    obligated "to scour the record in search of a genuine issue of triable fact").

26

27

28

United States District Court
Northern District of California

8

United States District Court
Northern District of California

# DISCUSSION

## I.   EVIDENTIARY ISSUES

### A.  Separately Filed Evidentiary Objections

Civil Local Rule 7-3(a) states, "Any evidentiary and procedural objections to [a] motion must be contained within the [opposition] brief or memorandum."  Civil Local Rule 7-3(c) similarly states, "Any evidentiary and procedural objections to the opposition must be contained within the reply brief or memorandum."

Despite these provisions, both parties have filed objections (as well as responses to objections) to evidence separate from their briefs and memoranda.  Dkt. Nos. 77, 82, 85, 86 & 89.  All these objections are STRUCK for failing to comply with the Local Rules.  Hennighan's objections, in particular, are also unsupported and appear to have been made for an improper purpose, unwarranted by existing law.

I have made independent determinations on the admissibility and materiality of the evidence presented, and admit the evidence referred to in this Order.  Any other objection is moot.[2]

---

[2] Counsel for Hennighan follows the letter of Federal Rule of Civil Procedure 56(c)(1)(A), which requires parties to "cit[e] to particular parts of materials in the record" when briefing a motion for summary judgment, but does not follow its spirit.

Rather than using concise *language* to explain why there is a genuine dispute of material fact or why Hennighan is entitled to judgment as a matter of law, counsel resorts to a heap of string cites.  Nowhere does he provide argument based on the underlying sources or explain what those cites actually say.  For example, in support of the simple proposition that sales agents are "closely monitored," counsel provides nearly 60 citations, without a single parenthetical or other statement explaining what each cite says.  Similarly, for the wholly unremarkable proposition that "Sales Agents, Sales Leaders, and Division Managers are transferred, promoted, and terminated by Insphere," counsel provides nearly 50 citations.  One proposition has nearly 100 items listed.  *See* Pl. Mot. 16.  Worse, some of the citations have no apparent relation to the proposition.

This pattern of abuse continues for another 50 or so propositions (though with varying amounts of citations).  Counsel could have wisely used his briefing pages for argument to assist his client.  While counsel may suppose that he has made a record for himself simply by throwing a spaghetti of facts against the judicial wall and seeing what disputed material fact sticks, he is wrong.  And the Ninth Circuit has made clear that such efforts cannot be countenanced.  As the court explained in a similar context:

United States District Court
Northern District of California

**B.  Testimony Before California Unemployment Appeals Board**

In his memoranda in opposition to Insphere's motion for summary judgment, Hennighan cites extensively to testimony given before the California Unemployment Appeals Board.[3]  *See* Mancuso Opp'n Decl. (Dkt. No. 81) Ex. A, Roth Dep. Tr.  Hennighan's counsel states that the testimony is drawn from a November 2, 2012, hearing conducted with the California Employment Development Department in the case of *Shirley Umamoto v. Insphere Insurance Solutions, Inc.* Mancuso Opp'n Decl. ¶ 2.

Section 1960 of the California Unemployment Insurance Code states, "Any finding of fact or law, judgment, conclusion, or final order" of the Board "shall not be used as evidence in any separate or subsequent action or proceeding" in any court.  CAL. UNEMP. INS. CODE § 1960. Section 1952 of the Code further provides that the Board is "not bound by common law or statutory rules of evidence or by technical or formal rules of procedure."  CAL. UNEMP. INS. CODE § 1952.

Generally, California law cannot bind a federal court on rules of procedure.  However, I am not persuaded that testimony before the Board constitutes admissible evidence.  First, Hennighan has not identified any relevance between that matter and this action.  Second, the proceedings were not subject to the usual rules of evidence, which renders some of the testimony inappropriate for consideration.  Third, Insphere did not have the same motive to develop testimony and rebuttal in the unemployment compensation hearing, where the stakes are much lower, as they do in this action.  Fourth, though Section 1960 does not apply to me, it matters that

> The cases often refer to the unfairness to the district court, which is substantial, but hardly the full story.  If a district court must examine reams or file cabinets full of paper looking for genuine issues of fact, as though the judge were the adverse party's lawyer, an enormous amount of time is taken away from other litigants.  Other litigants could have had judicial time, and get their cases resolved better and faster . . . . Requiring the district court to search the entire record for a genuine issue of fact, even though the adverse party does not set it out in the [ ] papers, is also profoundly unfair to the movant.

*Carmen*, 237 F.3d at 1031.

[3] The "transcript" of the proceedings was made on March 22, 2014—nearly a year and a half later—from an unauthenticated audio file.  *See* Mancuso Opp'n Decl. ¶ 2; Ex. A, Roth Dep. Tr. at 139.

United States District Court
Northern District of California

1  the California legislature has enacted this law and that another judge on this Court has decided to

2  follow it and deny admission of similar testimony.  *See Totah v. Lucasfilm Entm't Co. Ltd.*, No.

3  09-cv-4051-MMC, 2010 WL 5211457, at *7 n.21 (N.D. Cal. Dec. 16, 2010) (refusing to take

4  judicial notice of transcript), *aff'd*, 500 F. App'x 573 (9th Cir. 2012); *but see Baldwin v. Rice*, 144

5  F.R.D. 102 (E.D. Cal. 1992).

6          I will not consider Hennighan's citations to the proceedings in deciding these motions.  For

7  the same reasons, I will not consider the Board's rulings concerning a non-party, cited as authority

8  by Hennighan in his memorandum in support of his own motion for partial summary judgment, Pl.

9  Mot. (Dkt. No. 65) 10-11, in deciding that motion.

10         **C.  Declarations Accompanying Hennighan's Partial Motion For Summary Judgment**

11         Insphere argues that Hennighan's own declaration in support of his motion for partial

12  summary judgment should be struck because it "is rife with statements contradicting his sworn

13  deposition testimony."  Def. Opp'n (Dkt. No. 72) 3.  At the summary judgment phase, credibility

14  determinations and the weighing of evidence are not functions of the court.  *Anderson*, 477 U.S. at

15  252.  Nonetheless, "[t]he general rule in the Ninth Circuit is that a party cannot create an issue of

16  fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*,

17  952 F.2d 262, 266 (9th Cir. 1991).  A court is well within its discretion to disregard "sham"

18  declarations when deciding motions for summary judgment.  *See id.*

19         Insphere is correct that Hennighan's declaration contains conclusory assertions, without

20  any factual enhancement, that appear to contradict his deposition testimony.  While I will not

21  strike Hennighan's declaration *in toto*, I will only consider facts that do not appear to be a sham or

22  a blatant attempt to create a dispute of fact.

23         Insphere argues that Hennighan's counsel's declaration contains inappropriate factual

24  assertions that are not based on personal knowledge and make improper legal conclusions.  Def.

25  Opp'n 4.  For example, counsel claims, "Insphere controls every aspect of Sales Agents and Sales

26  Leaders work" and "Insphere executives send notifications talking about tracking their work,

27  conference calls, and threatening that if they do not meet Insphere expectations, they will be

28  terminated."  Mancuso Mot. Decl. (Dkt. No. 70) ¶¶ 19 & 20.  As Federal Rule of Civil Procedure

56(c)(4) states, "declaration[s] used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Many portions of counsel's declaration do not meet this standard and I will disregard them where warranted.

Hennighan has also submitted the declarations of Deborah O'Connell, Greg Umamoto, and Shirley Umamoto in support of his motion for partial summary judgment. *See* Dkt. Nos. 67-69. While these declarations may be helpful in providing information about Insphere generally, the California Court of Appeals has found it appropriate to disregard declarations in which nothing is said about the plaintiff herself. *See Beaumont-Jacques v. Farmers Grp., Inc.*, 217 Cal. App. 4th 1138, 1145-46 (2013) ("Nothing in [the] lengthy declaration mentions Appellant. We see no error in excluding this declaration."). The declarations proffered by Hennighan do not mention him at all. While I am not bound by state rules about evidence, I find these declarations to be less helpful for the reason articulated by the California Court of Appeals.[4]

## II.   WHETHER HENNIGHAN WAS AN INDEPENDENT CONTRACTOR

### A.  Applicable Law[5]

"Employers have varying responsibilities with respect to persons performing services on their behalf. These responsibilities depend, in part, on whether those persons are classified as employees or independent contractors under the Labor Code." *Cristler v. Express Messenger Sys., Inc.*, 171 Cal. App. 4th 72, 76 (2009). Because the California Labor Code does not expressly define "employee," the common law test for employment applies. *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 10 (Ct. App. 2007). "The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship." *Id.*

Where a plaintiff has provided services to the employer, the plaintiff has established a

---

[4] There are two other problems with these declarations. First, they are frequently conclusory, making legal conclusions instead of presenting reliable facts and the bases for those facts. Second, they are often vague with regard to time and context. The declarants worked for many years, in multiple positions, and under multiple entities. Yet their declarations rarely delineate when something was true and for whom it was true. I will consider any facts stated where appropriate.

[5] Hennighan concedes that the parties do not appear to dispute the law that applies in this case. Pl. Reply (Dkt. No. 87) 12.

1   prima facie case that an employer-employee relationship existed. *Robinson v. George*, 105 P.2d

2   914, 917 (1940). "Once the employee establishes a prima facie case, the burden shifts to the

3   employer, which may prove, if it can, that the presumed employee was an independent

4   contractor." *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010).

5           "The right to control the means by which the work is accomplished is clearly the most

6   significant test of the employment relationship . . . ."[6] *Tieberg v. Unemployment Ins. App. Bd.*, 2

7   Cal. 3d 943, 950 (1970). "An independent contractor is one who renders service in the course of

8   an independent employment or occupation, following his employer's desires only in the results of

9   the work, and not the means whereby it is to be accomplished." *Varisco v. Gateway Sci. & Eng'g,*

10  *Inc.*, 166 Cal. App. 4th 1099, 1103 (Ct. App. 2008) (citations and internal punctuation omitted).

11  "On the other hand, the relationship of master and servant or employer and employee exists

12  whenever the employer retains the right to direct how the work shall be done as well as the result

13  to be accomplished." *Id.* "But this rule requires that the right to exercise complete or authoritative

14  control, rather than mere suggestion as to detail, must be shown." *Id.* Generally, where an

15  employer is more concerned with the quality of the result rather than the manner in which the

16  work is done, that is evidence of an independent-contractor relationship. *Missions Ins. Co. v.*

17  *Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 211, 224 (Ct. App. 1981). "[T]he fact that a

18  certain amount of freedom of action is inherent in the nature of the work does not change the

19  character of the employment where the employer has general supervision and control over it."

20  *Toyota Motor Sales U.S.A., Inc. v. Super. Ct.*, 220 Cal. App. 3d 864, 875 (Ct. App. 1990).

21          However, because that test "is often of little use in evaluating the infinite variety of service

22  arrangements," *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989),

23  courts may consider the following factors:

24

---

25  [6] California courts have emphasized that "the right to control, rather than the amount of control

26  which was exercised, is the determinative factor." *S.A. Gerrard Co. v. Indus. Acc. Comm'n*, 17
    Cal. 2d 411, 414 (1941). In this case, the analysis may overlap because the parties have presented

27  little evidence about what pure *rights* Insphere has over its sales agents. But I am mindful of this
    principle and will assess the facts presented by the parties as evidence of Insphere's right to

28  control.

United States District Court
Northern District of California

(1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship.

*Estrada*, 154 Cal. App. 4th at 10.  Courts also consider whether the employer has the right to discharge at will without cause.  *Borello*, 48 Cal 3d. at 350.

"[T]he individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations."  *Germann v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 776, 783 (Ct. App. 1981).  That some factors suggest an employment relationship does not lead to the conclusion that such a relationship necessarily exists.  *Varisco*, 166 Cal. App. 4th at 1106.  "Under federal law, as under state law, the existence and degree of each factor regarding the status of a person as an independent contractor or employee is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law."  *Harris v. Vector Marketing Corp.*, 656 F. Supp. 2d 1128, 1136 (citations and punctuation omitted).  "Even if one or two of the individual factors might suggest an employment relationship, summary judgment is nevertheless proper when, as here, all the factors weighed and considered as a whole establish that [the plaintiff] was an independent contractor and not an employee . . . ."  *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal. App. 4th 580, 590 (Ct. App. 2011) (citation omitted).

"[I]n order to prevail on [a] motion for summary judgment . . . [an employer] would have to establish that a jury would be compelled to find that it had established by a preponderance of the evidence that the [plaintiff was an] independent contractor[ ]."  *Narayan*, 616 F.3d at 900.  The Ninth Circuit has recognized that "[t]his hurdle is particularly difficult for [a defendant] to overcome in light of . . . the multi-faceted test that applies in resolving the issue whether the [plaintiff is an] employee[ ]."  *Id.*  "[I]t is the rare case where the various factors will point with unanimity in one direction or the other."  *Id.* at 901 (citation omitted).  The Ninth Circuit quoted with approval a concurring opinion in *Secretary of Labor v. Lauritzen*, stating, "If we are to have multiple factors, we also should have a trial.  A fact-bound approach calling for the balancing of

1   incommensurables, an approach in which no ascertainable legal rule determines a unique outcome,

2   is one in which the trier of fact plays the principal part."  835 F.2d 1529, 1542 (7th Cir. 1987)

3   (Easterbrook, J., concurring).

4          Determining whether an employer controls the plaintiff in a manner such that the plaintiff

5   is either an employee or independent contractor depends on many facts.  One case, *Arnold v.*

6   *Mutual of Omaha Insurance Co.*, 202 Cal. App. 4th 580 (Ct. App. 2011), is particularly

7   instructive.  There, the California Court of Appeals affirmed the trial court's grant of summary

8   judgment finding that the plaintiff—an insurance sales agent—was an independent contractor.  In

9   reaching its decision, the court relied on the following facts:  (1) training is generally not

10  mandatory and only required with respect to compliance with state law; (2) while office space is

11  available, it is shared and not assigned; (3) agents are not reimbursed for business expenses; (4)

12  the plaintiff could determine the amount of time, place, and manner in which to solicit clients; (5)

13  the plaintiff solicited for other insurance companies while working for the defendant; (6) the

14  assistant general manager of the office did not supervise or evaluate the plaintiff's work; (7) there

15  was a minimum requirement to submit one application for a product to avoid termination; (8) the

16  plaintiff was paid by commission; (9) at the time of her appointment, the plaintiff and the

17  defendant understood that they were creating an independent-contractor relationship; and (10) the

18  plaintiff engaged in a distinct occupation requiring a license from the Department of Insurance.

19  *Arnold*, 202 Cal. App. 4th at 588-90.  Based on these facts, the court concluded, "we have little

20  difficulty concluding the trial court reached the correct conclusion," i.e., that the plaintiff was an

21  independent contractor.  *Id.* at 590.

22          Similarly, in *Beaumont-Jacques v. Farmers Grp., Inc.*, 217 Cal. App. 4th 1138 (2013), the

23  California Court of Appeals considered the trial court's grant of summary judgment finding that

24  the plaintiff was an independent contractor.  The plaintiff was a district manager of an insurance

25  company who supervised sales agents.  The court noted that the plaintiff "exercised meaningful

26  discretion with reference to her efforts," and while the defendants "had input over the quality and

27  direction of those efforts, they did not have sufficient 'control of the details' with respect to those

28  efforts."  *Id.* at 1140.  The plaintiff was paid on commission, signed a contract stating that she and

United States District Court
Northern District of California

15

the defendant were not in an employer-employee relationship, their contract was mutually terminable with 30 days' notice, the plaintiff determined her own hours, and deducted business expenses from her tax returns.  Notably, even though the defendant required business plans to be submitted and expected the managers to attend arranged meetings, the court stated that "a weighing and consideration of the record as a whole leads to the conclusion the trial court properly ruled, as a matter of law, that Appellant was an independent contractor."  *Id.* at 1145, 1147.

Several principles stand out in these cases.  Where a plaintiff "used her own judgment in determining whom she would solicit"; "the time, place, and manner in which she would solicit, and the amount of time she spent soliciting"; the "appointment [ ] was nonexclusive, and she in fact solicited for other insurance companies" where the manager did "not evaluate her performance and did not monitor or supervise her work; and training was voluntary, there is no significant right to control.  *Arnold*, 202 Cal. App. 4th at 589.  An individual who determines his own hours and break times "on most days" exercises "meaningful discretion."  *Beaumont-Jacques*, 217 Cal. App. 4th at 1145.  Required meetings and training related to legal compliance do not necessarily indicate an employment relationship.  *Desimone v. Allstate Ins. Co.*, No. 96-cv-3606-CW, 2000 WL 1811385, at *13 (N.D. Cal. Nov. 7, 2000); *Arnold*, 202 Cal. App. 4th at 589; *Missions Ins. Co.*, 123 Cal. App. 3d at 221 (stating that the fact that plaintiff "on occasion attended lectures or classes" is not evidence that the company "controlled *the manner in which the desired result was to be achieved*").  An individual who deducts costs as business expenses or identifies himself as self-employed on personal tax returns weighs in favor of finding an independent contractor relationship.  *Beaumont-Jacques*, 217 Cal. App. 4th at 1145.

On the other hand, a company "may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect . . . the right to make suggestions or recommendations as to details of the work . . . the right to prescribe alterations or deviations in the work—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship."  *McDonald v. Shell Oil Co.*, 44 Cal. 2d 785, 790 (1955).  The ultimate issue in this analysis is whether the company "controlled to any meaningful degree the means by which

United States District Court
Northern District of California

16

[the plaintiff] performed and accomplished her duties." *Beaumont-Jacques*, 217 Cal. App. 4th at 1145.

### B.  Application Of Law:  Control

The undisputed evidence shows that Hennighan was responsible for the means by which he performed his work and that Insphere did not meaningfully "control" him.  Hennighan was free to establish his own schedule and determine the extent to which he wanted to work.  He could choose which Insphere policies he wanted or did not want to sell.  Pl. 112:3-19.  There is no evidence that he was required to sell a certain number of policies within a given time period or to generate a certain amount of revenue.  Nor is there any evidence that he was required to work a certain number of hours.  He could set his own appointments or choose not to work at all.  Pl. Dep. 76:16-77:3.  Insphere did not control the means by which he interacted with clients, i.e., in person or by phone, nor how he sought leads, whether internally or through membership programs.

Insphere did not monitor or supervise the work of an agent.  Roth Decl. ¶¶ 2-3.  There is no evidence of any formal reviews ever occurring, nor has Hennighan put forward any evidence of informal reviews in which he or other agents were held accountable for the manner in which they sold Insphere's products.  Agents were not regularly in attendance at the office, and most training was voluntary except for sessions related to insurance rules and regulations.  Roth Decl. ¶ 2.  But required meetings or training do not necessarily indicate an employment relationship.  *Desimone*, 2000 WL 1811385, at *13.  Similarly, merely expecting agents to call in about their progress selling policies is simply evidence that Insphere was concerned about the agents' results and not the means by which they reached those results.

Hennighan had great latitude in the way he went about his work.  He had his own office outside of Insphere, he scheduled his own client appointments, and he took rest and lunch breaks whenever he chose.  Pl. Dep. 140:21-142:4, 241:24-242:4.  He did not have any guaranteed vacation because he could work as little or as much as he wanted.  He did not testify that he failed to receive rest or lunch breaks, or vacation time to which he was entitled.  Hennighan stated that he worked outside of the office at least half the time.  Pl. Dep. 237:15-240:7.

The strongest evidence advanced by Hennighan related to Insphere's expectations for its

United States District Court
Northern District of California

sales agents.  Hennighan declared that he was "required" to attend annual regional meetings, to participate in a weekly call-in team meeting, and to participate on a call-in production report meeting three times a week.  Hennighan Mot. Decl. ¶¶ 12-15; Greg Umamoto Decl. ¶ 5; Shirley Umamoto Mot. Decl. ¶ 3.  He points to testimony by others stating that sales agents were "required to be in the office three days a week for training" and that they could be terminated if they did not attend.  Pl. Opp'n (Dkt. No. 78) 5 (citing Mancuso Opp'n Decl. Ex. F, O'Connell Dep. 104:4-105:25, 150:15-20); Hennighan Mot. Decl. ¶ 16.  They were required to have a certain number of appointments per week and were pressured to produce business.  O'Connell Mot. Decl. ¶ 26.  Sales agents are required to go into the San Jose office regularly.  Shirley Umamoto Mot. Decl. ¶ 22.  Their productivity was monitored and they were held accountable to certain goals. Shirley Umamoto Mot. Decl. ¶¶ 14, 17.  Insphere also managed the way sales agents sold its products by requiring them to use an approved script when selling its products over the phone. Hennighan Mot. Decl. ¶ 10; Shirley Umamoto Mot. Decl. ¶ 35.  Workers also had to use Insphere-approved advertising materials and all means of advertising, including emails, social media, and physical media, were controlled by Insphere.  O'Connell Mot. Decl. ¶ 29.  Hennighan also says that he was limited in his ability to have outside business.  Henninghan Mot. Decl. ¶¶ 4-6.

The totality of the evidence does not raise a triable issue of fact that Insphere controlled the means by which Hennighan performed his work to such an extent that he was an employee.  Even if Insphere monitored sales agents' productivity and set goals for them, that only relates to the results Insphere expected, not the manner by which agents had to achieve those goals—the key distinction for showing control.  It also does not matter that agents had to attend training sessions-- that a plaintiff "on occasion attended lectures or classes" is not evidence that the company "controlled the manner in which the desired result was to be achieved."  *Missions Ins. Co.*, 123 Cal. App. 3d at 221.  As a business, it is also unremarkable that Hennighan had to call in to give periodic production reports on how his sales were going—indeed, counsel conceded at the motion hearing that these calls were brief.  Finally, the fact that Insphere might require a script or preapproved materials to be used in sales of its products does not in itself show an undue amount of control sufficient to tip the scale in favor of finding an employment relationship.

United States District Court
Northern District of California

1   Fundamentally, Insphere is selling a product, so it is not unreasonable to expect minimal standards

2   for remaining "on message," so long as Insphere has not "affirmatively assumed control,

3   interfered with or actively directed any details of the work being performed" by Hennighan.

4   *McDonald*, 44 Cal. 2d at 789.

5           Hennighan has pointed to almost "nothing about the manner in which [Insphere] want[s] or

6   expect[s]" him to sell policies, "nor the manner in which he should satisfy" any expectations they

7   have. *Beaumont-Jacques*, 217 Cal. App. 4th at 1146.

8           **C. Application Of Law: *Borello* Factors**

9           In addition to the element of control, California courts also look to the *Borello* factors.

10  They are instructive here because each weighs strongly in favor of Insphere except for two, which

11  are essentially neutral.

12                        **1. Distinct Occupation**

13          "If a worker is engaged in a distinct occupation or business, then that would suggest that

14  the worker is an independent contractor rather than an employee." *Harris*, 656 F. Supp. 2d at

15  1138-38. In other words, there must be evidence that the plaintiff "held herself out as a separate

16  occupation or business." *Id.*

17          Hennighan was engaged in insurance sales, which required state licenses. Pl. Dep. 35:7-

18  24, 146:4-22. This requirement suggests a distinct occupation. *Arnold*, 202 Cal. App. 4th at 589

19  (finding that the plaintiff "was engaged in a distinct occupation requiring a license from the

20  Department of Insurance"). Furthermore, Hennighan was affiliated with and sold insurance for

21  other companies, including a separate insurance agency, First Authority Insurance. The fact that

22  Hennighan sold insurance on behalf of other companies supports his classification as an

23  independent contractor. *Id.* (finding that the plaintiff's relationship "was nonexclusive, and she in

24  fact solicited for other insurance companies during her appointment"). Indeed, Hennighan

25  continued selling insurance after the termination of his contract with Insphere. Pl. Dep. 108:20-

26  24. Hennighan also identified himself as self-employed in his tax returns, thereby weighing in

27  favor of a independent-contractor relationship.

28          Hennighan offered testimony that Insphere's sales agents were at least discouraged, if not

                                                    19

forbidden, from working for other insurance companies.  Pl. Opp'n 3-4 (citing Mancuso Opp'n

Decl. Ex. F, O'Connell Dep. 21:22-23:20, 24:16-26:13, 26:24-29:5, 33:12-25).  In his declaration,

Hennighan claims that (1) he was instructed that he could only sell Insphere products; (2) he could

not sell products Insphere did not offer; (3) he could not solicit for insurance companies that were

not approved by Insphere; (4) he needed approval for any marketing materials he used; and (5) any

soliciting by phone had to be based on an Insphere-approved script.  Hennighan Mot. Decl. ¶¶ 3-

10.  Greg and Shirley Umamoto also declare that Insphere requires its sales agents to only sell

Insphere products; otherwise, they would be terminated.  Greg Umamoto Decl. ¶¶ 3-4; Shirley

Umamoto Mot. Decl. ¶ 9.

But the evidence nonetheless shows that Hennighan held himself out as a separate

business.  He sold insurance products outside of Insphere.  He stated on his tax returns that he was

self-employed.  That Hennighan apparently continued selling insurance after his termination by

Insphere also suggests an independent-contractor status.  *Ruiz v. Affinity Logistics Corp.*, 887 F.

Supp. 2d 1034, 1045 (S.D. Cal. 2012).  Hennighan provided conclusory testimony that Insphere

either discouraged or prohibited outside work and his counsel stated at the hearing that Hennighan

was doing something he should not have done.  But as Hennighan has noted, "realities, not

contractual labels, determine employment status."  Pl. Mot. 12.  Here, the reality is that Hennighan

acted as a separate business.  This factor weighs in Insphere's favor.

### 2. Supervision

"If the type of work performed is usually done under an employer's direction, it suggests

an employer-employee relationship; if the work is usually done by a specialist without

supervision, it suggests an independent contractor relationship."  *Ruiz*, 887 F. Supp. 2d at 1045.

Where a special license is needed, that suggests a lack of supervision and thus an independent-

contractor relationship.  *See id.* at 1045-46.  And where a plaintiff can "determin[e] her own day-

to-day hours, including her vacations" and "on most days, fix[ ] the time for her arrival and

departure at her office and elsewhere, including lunch and breaks," that suggests an independent-

contractor status.  *Beaumont-Jacques*, 217 Cal. App. 4th at 1144.  One court noted, "this factor is

largely duplicative of the control factor."  *Harris*, 656 F. Supp. 2d at 1139.

United States District Court
Northern District of California

The evidence shows that Hennighan set his own schedule, found his own leads, made his own appointments, decided what products to recommend, decided where to work, and furnished all means for his work.  His work also requires state licenses and continuing education.  Importantly, there is no evidence that Insphere supervised, dictated, critiqued, or even stayed informed about the means by which Hennighan performed his work.  While agents had goals set out for them and had to report their sales, and they would sometimes work in the San Jose office, "it is not necessarily unusual for sales employees to work under minimal supervision." *Harris*, 656 F. Supp. 2d at 1139.  This factor weighs strongly in favor of Insphere.

### 3.  Skill

"Where no special skill is required of a worker, that fact supports a conclusion that the worker is an employee instead of an independent contractor." *Harris*, 656 F. Supp. 2d at 1139.

The sale of insurance requires a certain degree of skill and expertise, as evidenced by the fact that agents must past a licensing test and have continuing education and relicensing requirements.  Indeed, Hennighan admitted that sales agents had to learn many new regulations, particularly due to new federal healthcare laws.  Pl. Dep. 239:17-240:4.  This factor weighs in Insphere's favor.

### 4.  Instrumentalities

Where the defendant "did not furnish the majority of the tools and instrumentalities" nor "a place to work," this fact weighs in favor of finding an independent-contractor relationship.  *Ruiz*, 887 F. Supp. 2d at 1047.  Where a plaintiff "used his own car, purchas[ed] its gas . . . and liability insurance," and "received no standard employee benefits," he is likely an independent contractor." *Beaumont-Jacques*, 217 Cal. App. 4th at 1144.

Here, Hennighan was responsible for providing his own equipment, including his car, cell phone, and laptop.  Hennighan paid for his car's gas and insurance even when he used it for work.  Hennighan was not given an office and he worked out of his own residence, clients' homes, or public places.  He also paid his own licensing fees and purchased his own leads.  Hennighan also took tax deductions for his business expenses. *See Beaumont-Jacques*, 217 Cal. App. 4th at 1145 (finding business deductions to be evidence of an independent-contractor relationship).  Insphere

21

provided him with no benefits, such as health insurance or vacation pay.  Although Hennighan notes that Insphere controls advertising materials and that Insphere "supplies" an office for agents, he does not explain why those facts mean that it "furnishes" the necessary instrumentalities of his job.  The furnishing of a shared office space, which agents need not use, for occasional client meetings is not significant.  This factor weighs in Insphere's favor.

### 5.   Length of Time

"Where a worker is employed for a lengthy period of time, the relationship with the employer looks more like an employer-employee relationship."  *Harris*, 656 F. Supp. 2d at 1140. Where there does not appear to be a contemplated end to the relationship, that weighs in favor of an employment relationship.  *Ruiz*, 887 F. Supp. 2d at 1048.

The relationship between Insphere and Hennighan lasted only two years.  Their contract was terminable at will by either side.  This factor is neutral.

### 6.   Method of Payment

"Where the worker is paid by the hour, it typically suggests an employment relationship; where the worker is paid by the job, it points toward independent contractor."  *Ruiz*, 887 F. Supp. 2d at 1048.  Hennighan was paid by commission only.  He did not receive 401(k) or other benefits that certain Insphere employees received.  Schooler Opp'n Decl. ¶ 5.  This factor weighs in Insphere's favor.

### 7.   Part of Regular Business

"When the work being done is an 'integral part' of the regular business of the purported employer, this serves as a 'strong indicator' that the worker is an employee."  *Ruiz*, 887 F. Supp. 2d at 1048 (citing *Borello*, 769 P.2d at 408).  Obviously, the work done by Hennighan is part of Insphere's regular business.  But in any direct sales business, what a sales representative does is a regular part of the company's business.  *Harris*, 656 F. Supp. 2d at 1140.  This factor is neutral.

### 8.   Parties' Belief

A court must look to "the parties' belief as to their relationship status."  *Ruiz*, 887 F. Supp. 2d at 1049.  Mere labels set out in an agreement do not establish the existence or non-existence of an employer-employee relationship.  *See Estrada*, 154 Cal. App. 4th at 10 (Ct. App. 2007).

22

United States District Court
Northern District of California

However, "a lawful agreement between the parties expressly stating that the relationship created is that of independent contractor should not be lightly disregarded . . . ." *Missions Ins. Co.*, 123 Cal. App. 3d at 226; *see also Arnold*, 202 Cal. App. 4th at 584-85.

The contract explicitly states that Hennighan is an independent contractor. Hennighan admits that he read the contract before signing it. Hennighan also identified himself as self-employed on his tax returns and deducted business expenses. A plaintiff who "deduct[s] costs as a business expense in her personal tax returns[,] and, identif[ies] herself as self-employed in those returns," is likely an independent contractor. *Beaumont-Jacques*, 217 Cal. App. 4th at 1145.

Hennighan argues that the fact that several sales agents filed complaints with the California Labor Commissioner about misclassification suggests that they believed they were actually employees. Pl. Mot. 20. That argument is not compelling, particularly since the contract was not for form only—as described above, the parties acted consistent with an independent-contractor relationship. This factor weighs in Insphere's favor.

### 9. Termination

A mutual termination clause is evidence of an independent-contractor relationship. *See Beaumont-Jacques*, 217 Cal. App. 4th at 1147; *see also Desimone*, 2000 WL 1811385, at *15 ("A mutual termination provision is consistent either with an employment-at-will relationship or parties in a continuing contractual relationship.") (quotation marks and citation omitted); *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal. App. 4th 580, 589 (Ct. App. 2011) ("a termination at-will clause for both parties may properly be included in an independent contractor agreement, and is not by itself a basis for changing that relationship to one of an employee"). Since there was a mutual termination clause here, this factor weighs in favor of Insphere.

### D. Hennighan's Arguments

Hennighan cites *Hopkins v. Cornerstone America*, 545 F.3d 338 (5th Cir. 2008), as support for his position and says that "Defendant has already lost this issue [of whether Hennighan is an employee or not] with regards to Sales Leaders." Pl. Mot. 8. He states that "the Fifth Circuit ruled that Cornerstone—which later became Insphere—improperly classified Sales Leaders as independent contractors instead of employees." Pl. Mot. 8-9. This case is inapposite for two

reasons.  First, sales leaders are not the same position as sales agents and their responsibilities are completely different—as the court recognized, sales leaders are "primarily responsible for recruiting, training, and managing a team of subordinate sales agents."  *Id.* at 342.  Second, *Hopkins* was brought under the Fair Labor Standards Act and the court assessed, "as a matter of economic reality, [whether] the worker is economically dependent upon the alleged employer or is instead in business for himself."  *Id.* at 343.  This analysis is quite different than the test under California law for whether an independent-contractor relationship exists.  *Hopkins* does not apply.

Hennighan also cites another case in support, *Cutter v. HealthMarkets, Inc.*, No. 10-cv-11488 (D. Mass. 2011).  Pl. Mot. 11.  Hennighan submits several documents in the case as exhibits, but only one of them appears to be an actual order.  Mancuso Mot. Decl. Ex. H.  The order is simply an adopted proposed order certifying a class of "[a]ll persons who worked as agents or district sales leaders in Massachusetts selling insurance products on behalf of HealthMarkets, Inc. . . ."  Ignoring the fact that HealthMarkets is no longer a party to this case, and that *Cutter* dealt with Massachusetts law, an adopted proposed order which says little more than what is quoted above is not a "ruling that Sales Agents and Sales Leaders did in fact hold common positions and perform common services," as Hennighan asserts.  Pl. Mot. 11.

Finally, Hennighan cites *Toyota Motor Sales U.S.A., Inc. v. Superior Court*, 220 Cal. App. 3d 864, 877 (Ct. App. 1990), for the proposition that the mere fact that he deducted certain business expenses on his tax returns "cannot be used to prove independent contractor status."  Def. Opp'n 18.  His counsel pointed to *Toyota* again at the motion hearing as strongly supportive of Hennighan.

In *Toyota*, the plaintiff was injured in a car accident when he was rear-ended by a pizza deliveryman.  The plaintiff sued his own car's manufacturer (for having allegedly defective seatbelts), the pizza company, and the deliveryman himself.  After the pizza company and deliveryman settled with the plaintiff and the trial court found the settlements to be in good faith, the trial court dismissed Toyota's cross-complaint against the pizza company for comparative equitable indemnity based on its conclusion that the deliveryman was an independent contractor and, accordingly, the pizza company was not liable under respondeat superior.  Toyota appealed.

1    The Court of Appeals vacated the trial court's order, reasoning that the deliveryman was subject to

2    the total control of the pizza company except for perhaps which route he could take or how fast he

3    could drive.  Hennighan's counsel argues that Hennighan is similarly limited in his discretion.

4        *Toyota* is distinguishable.  Insurance sales agents, who are licensed independently by the

5    State of California, are not comparable to pizza deliverers.  The Court of Appeals observed that

6    the pizza company "directed and controlled (1) the number, nature and type of pizzas to be

7    delivered, (2) the time when such deliveries would take place, (3) the persons and locations to

8    whom they would be delivered and (4) the price to be charged for each pizza and the total amount

9    of money to be collected from each customer.  In short, [the pizza company] determined what

10   would be delivered, when and to whom and what price would be charged."  *Id.* at 875-76.  Here,

11   there is no evidence that Insphere directed the number, nature, or type of insurance policies

12   Hennighan must sell.  Nor is there evidence that Hennighan had to work certain hours, had to sell

13   to certain persons, or had to charge a particular price.  The court also noted that "the only evidence

14   offered in support of the claim that [the deliveryman] was an independent contractor was that he

15   provided his own car, expenses and insurance."  *Id.* at 876.  Here, in addition to paying for his

16   own car and its insurance, there is significantly more evidence showing that Hennighan is an

17   independent contractor.

18       In *Toyota*, the pizza company required the deliveryman to pay his own taxes.  The court

19   correctly observed, "An employer cannot change the status of an employee to one of independent

20   contractor by illegally requiring him to assume burdens which the law imposes directly on the

21   employer."  *Id.* at 877.  The issue here is whether Hennighan was an independent contractor in the

22   first place who was legally obligated to pay his own taxes.  He was.  *Toyota* does not apply.

23       **E.  Exemption**

24       The California Labor Code expressly does "not include any individual employed as an

25   outside salesman."  CAL. LAB. CODE § 1171.  "Outside salesperson" is defined as any person "who

26   customarily and regularly works more than half the working time away from the employer's place

27   of business selling tangible or intangible items or obtaining orders or contracts for products,

28   services or use of facilities."  CAL. CODE REGS. tit. 8, § 11070.  "Working time" includes time

United States District Court
Northern District of California

25

1   spent on "other related activities [related to "selling"] such as preparation, travel time, and

2   paperwork." *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 801 (1999).

3       Hennighan admitted that he spent more than 50 percent of his time outside of the office.

4   Pl. Dep. 237:15-240:7.  He sold Insphere-approved insurance products through direct client

5   contact and stated that "[a] lot" of his work was done at either clients' houses or in public settings

6   away from the office.  Pl. Dep. 119:17-19.  Insphere argues that Hennighan "does not dispute, and,

7   therefore concedes, that, if he were an employee, he would be classified under the outside sales

8   exemption and would not be entitled to overtime, or meal and rest breaks."  Pl. Reply (Dkt. No.

9   87) 1.

10       With respect to this issue, without deciding or relying on it, Insphere seems to have the

11   better argument.

12       **F.  Conclusion**

13       I am persuaded that Insphere is entitled to judgment as a matter of law that Hennighan is

14   an independent contractor.  Any control Insphere exercised over Hennighan was generally

15   unrelated to the manner and means by which Hennighan accomplished his work and was directed

16   more towards the results.  An analysis of the amount of control exerted by Insphere and the

17   *Borello* factors showed that all the factors were either in Insphere's favor  or neutral.  "Even if one

18   or two of the individual factors might suggest an employment relationship, summary judgment is

19   nevertheless proper when, as here, all the factors weighed and considered as a whole establish that

20   [Hennighan] was an independent contractor and not an employee . . . ."  *Arnold*, 202 Cal. App. 4th

21   at 590.  Hennighan did not successfully point to any *genuine* dispute of material fact sufficient to

22   prevent summary judgment.

23   **III.   WHETHER THE CAUSES OF ACTION FAIL AS A MATTER OF LAW**

24       At the motion hearing, I asked Hennighan's counsel whether Hennighan's causes of action

25   would all fail as a matter of law if I determined that Hennighan was an independent contractor.

26   He conceded that all of them would except for the First and Second Causes of Action for

27   retaliation.  However, California law does not afford independent contractors a right to relief for

28   wrongful termination.  *See Sistare-Meyer v. Young Men's Christian Ass'n*, 58 Cal. App. 4th 10, 18

United States District Court
Northern District of California

1  (1997) (holding that independent contractors cannot bring wrongful termination claims based on

2  public policy predicated on racial discrimination); *see also Ali v. L.A. Focus Publ'n*, 112 Cal. App.

3  4th 1477, 1484 (2003) ("Several appellate courts . . . have held that, because independent

4  contractors are not employees, they lack standing to assert a claim for wrongful termination in

5  violation of public policy."), *disapproved of on other grounds by Reid v. Google, Inc.*, 50 Cal. 4th

6  512 (2010).  Accordingly, all of Hennighan's causes of action fail as a matter of law and summary

7  judgment should be granted to Insphere on all of them.  *See Taylor v. Waddell & Reed Inc.*, No.

8  09-cv-02909, 2013 WL 435907, at *7 (S.D. Cal. Feb. 1, 2013) ("the Court need not address

9  Jaeger's additional state law claims . . . as these claims are conditioned upon Jaeger being properly

10  classified as an employee").

### CONCLUSION

12       Because there is no genuine dispute of material fact and the evidence shows that

13  Hennighan is an independent contractor as a matter of law, Insphere's motion for summary

14  judgment is GRANTED and Hennighan's motion for partial summary judgment is DENIED.

15       The Clerk is directed to enter judgment accordingly and close the file.

16       **IT IS SO ORDERED.**

17  Dated: April 21, 2014



WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California